**Mrs. Billie B. McCLURE, Plaintiff-Appellant,**

v.

**The SALVATION ARMY, Defendant-Appellee.**

**No. 71–2270.**

United States Court of Appeals, Fifth Circuit.

March 17, 1972.

On Rehearing April 26, 1972.

See also D.C., 51 F.R.D. 215.

Andrew C. Hall, Edward L. Greenblatt, William R. King, Atlanta, Ga., for plaintiff-appellant.

John F. Goemaat, John de J. Pemberton, Jr., Julia P. Cooper, Equal Employment Opportunity Comm., Washington, D. C., amicus curiae.

Jefferson D. Kirby, III, Harry V. Lamon, Jr., Atlanta, Ga., for defendant-appellee; Hansell, Post, Brandon & Dorsey, Atlanta, Ga., of counsel.

William J. Moss, John K. Bouman, Cadwalader, Wickersham & Taft, New York City, amicus curiae.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

COLEMAN, Circuit Judge:

The Salvation Army is a church and Mrs. Billie B. McClure is one of its ordained ministers, see facts set forth in the published opinion of the District Court, McClure v. Salvation Army, 323 F.Supp. 1100 (N.D., Ga., 1971).

Mrs. McClure brought suit below, dismissed for lack of jurisdiction, which requires a determination of whether Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e, et seq.] applies to the employment relationship between a church and its ministers and, if applica-

ble, whether the statute impinges upon the Religion Clauses of the First Amendment.[1] Restricting our decision to the church-minister relationship and expressly refraining from any decision as to other church employees of a type not involved in this controversy, we affirm the judgment rendered below.

After undergoing a two year training period at The Salvation Army's Officers Training School, Mrs. McClure was commissioned as an officer [minister] in June, 1967. She then received various assignments within the Southern Territory, first as a Corps Commander, next as a Welfare Casework Supervisor in Divisional Headquarters, and finally as a secretary in the Territorial Headquarter's Public Relations Department.

After her officer status had been terminated by The Salvation Army, Mrs. McClure began a civil action against that organization in the United States District Court for the Northern District of Georgia, alleging that it had engaged in discriminatory employment practices against her in violation of Title VII.[2]

More specifically, she alleged that she had received less salary and fewer benefits than that accorded similarly situated male officers, also that she had been discharged because of her complaints to her superiors and the Equal Employment Opportunity Commission [EEOC] with regard to these practices.

She sought reinstatement, an injunction against further discriminatory practices, and a judgment for the alleged deficiency in compensation paid to her as compared to male Salvation Army officers whose responsibilities were equivalent to those she performed.

The Salvation Army moved to dismiss the complaint for want of jurisdiction in that (1) it was neither an "employer" nor a person engaged in an "industry affecting commerce" within the meaning of §§ 701(b) and (h)[3] of Title VII and (2) since it is a "religious corporation" for which Mrs. McClure had voluntarily agreed to perform "work connected with the carrying on by such corporation * * * of its religious activities", it was not subject to the provisions of Title VII by reason of § 702 thereof.[4]

1. The First Amendment of the Constitution of the United States provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *."

2. Section 703(a) of Title VII, 42 U.S.C. § 2000e–2(a) reads as follows:

"(a) It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

3. Section 701(b) of Title VII, 42 U.S.C. § 2000e–(b) reads as follows:

"(b) The term 'employer' means a person engaged in an industry affecting commerce who has twenty-five or more

employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or a State or political subdivision thereof, (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26 * * *."

Section 701(h) of Title VII, 42 U.S.C. § 2000e(h) reads as follows:

"(h) The term 'industry affecting commerce' means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry 'affecting commerce' within the meaning of the Labor-Management Reporting and Disclosure Act of 1959."

4. Section 702 of Title VII, 42 U.S.C. § 2000e–1 reads as follows:

"This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to

556

There was also an answer, asserting, inter alia, that since it is a church, application of the provisions of Title VII to The Salvation Army under the circumstances presented by this action would constitute a violation of the First Amendment of the Constitution of the United States.

Mrs. McClure later filed a motion for leave to file an amended and supplemental complaint; to maintain the suit as a class action on behalf of all female officers and all former female officers of The Salvation Army in the United States; and to add The Salvation Army, a religious and charitable organization operating in the United States as four separate corporations, each operating under the corporate name, "The Salvation Army", as a party defendant.

Action on this motion was delayed pending action on The Salvation Army's motion to dismiss for want of jurisdiction.

Upon a hearing on the motion to dismiss (at which both parties presented witnesses) the District Court found that The Salvation Army was a religion [5] and concluded that Mrs. McClure's activities ". . . were connected with carrying on of the religious activities of The Salvation Army" in accordance with § 702 of Title VII. Apparently concluding that such a finding exempted The Salvation Army from liability for the alleged discrimination, the District Court then sustained the motion to dismiss for want of jurisdiction.

On appeal, neither Mrs. McClure nor the EEOC, as *amicus curiae,* question the Salvation Army's status as a reli-

gion or her status as a minister engaged in the religious or ecclesiastical activities of the church. However, they contend that the Army is not exempt from the prohibitions of Title VII and is therefore liable for discriminating against Mrs. McClure on the basis of sex with respect to compensation, terms, conditions or privileges of employment.

The Salvation Army again contends, as it did in the District Court, that it is neither an "employer" nor is Mrs. McClure an "employee" within the definition of those terms as defined by Title VII. Should we disagree with this contention, it then urges that the exemption provided by § 702 of Title VII applies to The Salvation Army "with respect to its officers (ordained ministers) performing work connected with The Salvation Army's religious activities". Were we to decide that the exemption provided by § 702 is not applicable to the facts as presented by this appeal, The Salvation Army urges that the application of the provisions of Title VII to the relationship between it and its officers (a church and its ministers) is violative of the Religion Clauses of the First Amendment.

I

■ If the provisions of Title VII are to apply to the relationship between The Salvation Army and Mrs. McClure it is necessary that it be an "employer" engaged in an "industry affecting commerce" and that she be an "employee" as those terms are defined by § 701(b) (f) and (h) of the Title.[6]

In addition to not *specifically* excluding religious organizations from the

a religious corporation, association, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, or society of its religious activities or to an educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution."

5. For court decisions recognizing The Salvation Army's status as a religious organ-

ization see Salvation Army v. United States, 138 F.Supp. 914 (S.D.N.Y., 1956); Bennett v. City of LaGrange, 153 Ga. 428, 112 S.E. 482 (1922); Hull v. State, 120 Ind. 153, 22 N.E. 117 (1889).

6. Section (f) of Title VII, 42 U.S.C. § 2000e(f) reads as follows:
"(f) The term 'employee' means an individual employed by an employer."
See Footnote 3, *supra.*

term as defined, the intention of Congress to allow such an organization to qualify as an "employer" is shown by the fact that in subsequent provisions of Title VII, limited and specific exemption from the Title's prohibitions were provided for them. The effect of these provisions is to cause a religious organization qualifying as such to be considered as an "employer", and to eliminate only certain of their employment relations from the prohibitions of Title VII.

■ That The Salvation Army qualifies as an "employer" engaged in an "industry affecting commerce" is illustrated by the following facts: Employment figures for the Army show approximately 3,000 people located in the several states which comprise the territory which it classifies as "employees", whose gross annual earnings are over $7,-000,000 plus an additional 1,330 officers which it classifies as "non-employees"; an interstate activity responsible for administering and expending funds in excess of $147,000,000, managing property holdings worth more than $62,000,000 as of 1969, and deriving an income of $30,000,000 a year, of which $9,000,000 is derived from interest, dividends, sales, and services; a paper, "The War Cry", is printed by the national organization and sold nationwide, which produces income.

■ The existence of these facts demonstrates that The Salvation Army, though a religious organization not organized to engage in commerce, is nevertheless an "employer" engaged in an "industry affecting commerce". Organizations affecting commerce may not escape the coverage of social legislation by showing that they were created for fraternal or religious purposes. Polish National Alliance of the United States v. NLRB, 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509 (1944); Mitchell v. Pilgrim Holiness Church Corp., 7 Cir., 1954, 210 F.2d 879, cert. denied 347 U.S. 1013, 74 S.Ct. 867, 98 L.Ed. 1136 (1954).[7]

Because Title VII's definition of "employee" is not restrictive, the existence of such a status for a certain individual must turn on the facts of each case.

After filing an application, Mrs. McClure was selected by The Salvation Army as a candidate for officership. She was then trained in all phases of her duties for a period of two years. After her training was completed, she was commissioned as an officer. Her assignments to various positions in the Southern Territory were completely within the control of her superiors. Supervision over the performance of her work was maintained through the direct observance of a superior officer, the use of reports and the audit of certain records that were kept by her. At no time was she allowed to undertake a project without the approval of a superior officer. She was subject at all times to the right of termination retained by The Salvation Army. Her amount of compensation was governed by a national salary schedule set by The Salvation Army, which also provided her with workmen's compensation insurance.

■ Thus the record shows that Mrs. McClure was selected, employed, controlled, trained, and paid by The Salvation Army. When the existence of such factors is shown, the individual falls within the definition of "employee". See Tarboro v. Reading Company, 3 Cir., 1968, 396 F.2d 941, cert. denied 393 U.S. 1027, 89 S.Ct. 637, 21 L.Ed.2d 569 (1969); Santa Rosa Island Authority v. F. Rust Smith & Sons, Inc., 5 Cir., 1962, 303 F.2d 576.

■ The Salvation Army's contention that Mrs. McClure is a volunteer because the terms of her application state that she will regard herself as such, ignores the fact that employment contracts cannot be used to waive protections granted to employees by an Act of Congress. See J. I. Case Company v. NLRB, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944).

7. The Salvation Army did not seriously question its status as an 'employer' in its brief. However, we feel it is necessary to discuss its status as such.

We next consider the effect of § 702. This section provides certain employment relations with an exemption from the prohibitions of Title VII.

Mrs. McClure and the EEOC contend that the exemption permits a religious organization to discriminate only on the basis of religion. They contend that the section was intended to allow a religious organization to employ persons of a particular faith to perform work connected with the carrying on of their religious activities without otherwise violating the provisions of Title VII. Both the language and the legislative history of the section support this contention. The original House version of § 702 contained in H.R. 7152 provided a religious organization with a blanket exemption from the provisions of Title VII. This version reads as follows:

"This title shall not apply to an employer with respect to the employment of aliens outside any State or to a religious corporation, association, or society."

This broad exemption for religious organizations proposed by the House was limited by Substitute Senate Amendment No. 656 which ultimately became law. Senator Humphrey, the Majority Leader of the Senate and a principal sponsor of the substitute amendment, explained that the Senate Amendment limited the blanket exemption given to religious organizations:

"Section 704 formerly Section 703 and later renumbered as Section 702 has been amended to limit the general exemption of religious groups to those practices relating to the employment of individuals of a particular religion to perform work connected with the employer's religious activities . . . ." 110 Cong.Rec. 12818.

The language and the legislative history of § 702 compel the conclusion that Congress did not intend that a religious organization be exempted from liability for discriminating against its employees on the basis of race, color, sex or national origin with respect to their compensation, terms, conditions or privileges of employment.

This view necessitates consideration of the constitutional issue.

## II

Does the application of the provisions of Title VII to the relationship between The Salvation Army and Mrs. McClure (a church and its minister) violate either of the Religion Clauses of the First Amendment?

The Supreme Court has many times recognized that the First Amendment has built a "wall of separation" between church and State. Though that "wall of separation" between permissible and impermissible intrusion of the State into matters of religion may blur, or become indistinct, or vary, it does and must remain high and impregnable. In Everson v. Board of Education, 330 U.S. 1, 67 S. Ct. 504, 91 L.Ed. 711 (1947), it was said, "We could not approve the slightest breach".

Only in rare instances where a "compelling state interest in the regulation of a subject within the State's constitutional power to regulate" is shown can a court uphold state action which imposes even an "incidental burden" on the free exercise of religion. In this highly sensitive constitutional area " '[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation' ". Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Restrictions on the free exercise of religion are allowed only when it is necessary "to prevent grave and immediate danger to interests which the state may lawfully protect". West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). "[T]he power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom". Cantwell v. Connecticut, 310 U.S. 296, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

The relationship between an organized church and its ministers is its lifeblood.

The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern. Just as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection. It is unavoidably true that these include the determination of a minister's salary, his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church.

It has long been the practice of The Salvation Army, as with many other religious denominations, to determine these matters which deal with the very terms of a minister's calling. Such a practice must be classified as both basic and traditional.

In Watson v. Jones, 13 Wall. 679, 80 U.S. 679, 20 L.Ed. 666 (1871), the Supreme Court began to place matters of church government and administration beyond the purview of civil authorities. In *Watson,* one of two factions struggling for control of church property had been recognized by the highest ecclesiastical body of the Presbyterian Church as the "regular and lawful" governing body of the church. From a state court's decision that it was bound by the ecclesiastical ruling, the dissident faction appealed. The Supreme Court affirmed, stating:

"... whenever the questions of discipline, or of faith or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." Id. at 727.

Over fifty years later in Gonzalez v. Roman Catholic Archbishop, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929), the petitioner was attempting to challenge a decision by the Archbishop of Manila, who had refused to appoint him to chaplaincy on the ground that, according to the

Canon Law then in force, he did not possess the required qualifications. In upholding the Archbishop's interpretation of the Canon Law, the Supreme Court said:

"* * * In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise. * * *." Id. at 16, 50 S.Ct. at 7.

In Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952), the principle announced by *Watson* and *Gonzalez* became a constitutional prohibition. Legislation had been passed which transferred administrative control of Russian Orthodox churches in North America from the Patriarch of Moscow to authorities selected by a convention of the North American churches. This resulted in appointees of the Patriarch of Moscow being denied the use and occupancy of St. Nicholas Cathedral in New York City. Holding the New York law to be an unconstitutional interference with the free exercise of religion, the Supreme Court stated that "legislation that regulates church administration, the operation of the churches [or] the appointment of clergy * * * prohibits the free exercise of religion". Id. at 107, 73 S.Ct. at 150.

The case was then remanded to the Court of Appeals of the State of New York, which ordered a retrial of the question of the appellee's right to use and occupancy of the cathedral on a common law issue assertedly left open by the Supreme Court's decision in *Kedroff.* The Court of Appeals rendered a decision holding that, under the common law of New York, the Patriarch's appointees were not entitled to exercise the right of use and occupancy granted to them by virtue of Canon Law. The Supreme Court again reversed, holding that constitutional principles prevent *the judiciary, as well as the legislature,*

from interfering with the free exercise of religion. Kreshik v. St. Nicholas Cathedral, 363 U.S. 190, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960).

Recently in Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), the Supreme Court warned that " * * * First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. * * *." Id. at 449, 89 S.Ct. at 606.

A common thread runs through these opinions, which is best exemplified by those words used by the Supreme Court in commenting on its holding in Watson v. Jones, *supra*. For throughout these opinions there exists "a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. * * *." Kedroff v. St. Nicholas Cathedral, *supra*, 344 U.S. at 116, 73 S.Ct. at 154.

In her complaint, Mrs. McClure has charged that The Salvation Army engages in certain practices with regard to a minister's assignment, his salary, and his duties, which have been declared unlawful by Title VII. However, it would be useless to argue that these decisions are not matters of church administration and government and thus, purely of ecclesiastical cognizance.

An application of the provisions of Title VII to the employment relationship which exists between The Salvation Army and Mrs. McClure, a church and its minister, would involve an investigation and review of these practices and

decisions and would, as a result, cause the State to intrude upon matters of church administration and government which have so many times before been proclaimed to be matters of a singular ecclesiastical concern. Control of strictly ecclesiastical matters could easily pass from the church to the State. The church would then be without the power to decide for itself, free from state interference, matters of church administration and government.

Moreover, in addition to injecting the State into substantive ecclesiastical matters, an investigation and review of such matters of church administration and government as a minister's salary, his place of assignment and his duty, which involve a person at the heart of any religious organization, could only produce by its coercive effect the very opposite of that separation of church and State contemplated by the First Amendment. As was said by Justice Clark in School District of Abington Tp., Pa. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), "the breach of neutrality that is today a trickling stream may all too soon become a raging torrent * * *".

■■ We find that the application of the provisions of Title VII to the employment relationship existing between The Salvation Army and Mrs. McClure, a church and its minister would result in an encroachment by the State into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment. Yet, "if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." Ashwander v. Tennessee Valley Authority, 1936, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (concurring opinion of Mr. Justice Brandeis). We therefore hold that Congress did not intend, through the nonspecific wording of the applicable provisions of Title VII, to regulate the em-

ployment relationship between church and minister. The order of the District Court sustaining The Salvation Army's motion to dismiss the complaint for want of jurisdiction is

Affirmed.

ON PETITION FOR REHEARING

PER CURIAM:

It is ordered that the parties bear their own costs in this Court and in the district court.