COULEE CATHOLIC SCHOOLS, Petitioner-Appellant,†

v.

LABOR AND INDUSTRY REVIEW COMMISSION,
Department of Workforce Development and
Wendy Ostlund, Respondents-Respondents.

Court of Appeals

*No. 2007AP496. Submitted on briefs August 7, 2007.
—Decided April 17, 2008.*

2008 WI App 68

(Also reported in 752 N.W.2d 341.)

† Petition to review filed.

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *James G. Birnbaum, Ross A. Seymour, Jessica T. Kirchner* of *Birnbaum, Seymour, Kirchner & Birnbaum, LLP*, La Crosse.

On behalf of the respondent-respondent, Labor and Industry Review Commission, the cause was submitted

on the brief of *David C. Rice*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

On behalf of the respondent-respondent, Wendy Ostlund, the cause was submitted on the brief of *Dawn Marie Harris* and *Ryan D. Olson* of O'Flaherty Heim Egan, Ltd., La Crosse.

Before Higginbotham, P.J., Vergeront and Lundsten, JJ.

¶ 1. VERGERONT, J. The issue on this appeal is whether the "ministerial exception," grounded in the First Amendment, precludes adjudication of Wendy Ostlund's age discrimination complaint filed against Coulee Catholic Schools (CCS). The Labor and Industry Review Commission (LIRC) concluded it does not, and the circuit court affirmed. We conclude that the ministerial exception does not apply to Ostlund's position as a first-grade teacher. CCS does not argue that there is any other First Amendment bar to adjudicating Ostlund's claim. We therefore affirm.

## BACKGROUND

¶ 2. Ostlund was employed as a first-grade teacher at St. Patrick's Elementary School from 1974 until June 2002. St. Patrick's is part of the Coulee Catholic Schools (CCS) Association and is owned and operated by the Roman Catholic Diocese of La Crosse, Wisconsin. In March 2002, when Ostlund was fifty-three, CCS notified Ostlund that her employment contract would not be extended for the 2002–03 school year. Ostlund filed a complaint with the Equal Rights Division of the Wisconsin Department of Workforce Development alleging age discrimination under the Wiscon-

sin Fair Employment Act (WFEA), WIS. STAT. §§ 111.31–111.395 (2005–06).[1]

¶ 3. CCS moved to dismiss the complaint on the ground that Ostlund's position was "ministerial" under *Jocz v. LIRC*, 196 Wis. 2d 273, 538 N.W.2d 588 (Ct. App. 1995), and therefore adjudication of her complaint would infringe on CCS's First Amendment right to the free exercise of religion. CCS also asserted that the reason Ostlund's contract was not renewed was that there was a reduced need for staff because of a school closing. Ostlund had been selected for nonrenewal, CCS stated, because she had a degree in physical education, not elementary education, and she was not certified to teach first grade.

¶ 4. An administrative law judge (ALJ) presided at an evidentiary hearing on CCS's motion. The ALJ's written decision contained a number of findings of fact, which included the following. Ostlund was a Catholic and a member of St. Patrick's Parish; she was not a member of a religious order. CCS did not require its elementary school teachers to be members of any religious order or members of the Catholic Church. It did require teachers to have the diocese's basic and advanced certifications in religious education, which involved their attending instruction in the Catholic faith and how to teach the Catholic faith. Ostlund maintained these certifications. Ostlund's job description contained four main components—religious atmosphere, teaching responsibilities, supervising responsibilities, and professional responsibilities—with detailed responsibilities under each. The only responsibility that specifically mentioned religion in the teaching, super-

---

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

vising, and professional components was the professional responsibility to "earn and maintain religious certification."[2]

¶ 5. With respect to Ostlund's duties the ALJ determined:

> Ms. Ostlund's primary duty was to instruct her students in a core of disciplines, consisting of reading, social studies, science, math, handwriting and religion. Although she taught religion for about one half-hour four times per week, led brief prayers about twice per day, at times made references to religious symbols as aids when teaching core subjects other than religion, occasionally incorporated a religious theme into her social studies class, prepared her students several times per year to present a liturgy and supervised them during their attendance at weekly liturgies, all these religiously-related activities did not constitute her primary duty.

The ALJ also found that Ostlund's loss of employment was not caused by any failure on her part to abide by the religious principles of CCS.

---

[2] The "religious atmosphere" component provided:

I. Religious Atmosphere

A. Provide a good Christian model and example in one's attitudes and actions.

B. Encourage spiritual growth in students by developing inner discipline, character, morals, and values.

C. Provide leadership in living and celebrating life and liturgies.

In addition to this section and the sections on teaching, supervising, and professional responsibilities, there was a fifth heading entitled "Grade level responsibilities" and a sixth heading entitled "Responsible to comply with all areas addressed in the contract and the policies of the Diocese of La Crosse"; neither of these latter two headings was followed by specific duties.

¶ 6. The ALJ concluded that Ostlund's position was not ministerial within the meaning of *Jocz*. Therefore, the ALJ decided, adjudication of her complaint would not violate CCS's First Amendment rights and the Department had subject matter jurisdiction over her complaint.

¶ 7. CCS appealed to LIRC. LIRC adopted the findings and conclusions of the ALJ. LIRC's memorandum opinion explained why it concluded Ostlund's position was not ministerial under *Jocz*. The opinion also stated that two additional inquiries were relevant: (1) whether this case involved ongoing involvement by the agency, and (2) whether adjudication would implicate any religious doctrine. LIRC answered both these questions in the negative.

¶ 8. CCS petitioned for review of LIRC's decision in the circuit court and the circuit court affirmed. The circuit court concluded that LIRC had subject matter jurisdiction and the issue was whether LIRC was precluded from adjudicating Ostlund's complaint under the First Amendment. Contrary to LIRC's position, the circuit court concluded that under *Jocz* the only inquiry was whether the position was ministerial and it was not permissible to inquire into the nature of Ostlund's claim or CCS's response. However, the circuit court agreed with LIRC that Ostlund's position was not ministerial and affirmed on that ground.

## DISCUSSION

¶ 9. On appeal CCS contends that LIRC erred in concluding that Ostlund's position was not ministerial because it focused on the *time* Ostlund spent teaching secular subjects compared to teaching religion and attending mass. In doing so, argues CCS, LIRC over-

looked the following evidence: the primary mission of Catholic schools is to teach the Catholic faith; the role of Catholic schools is essential to carrying out the pastoral mission of the Roman Catholic Church; Ostlund was required as a contract condition of her employment to model and support Catholic doctrine and she believed she did so; and Ostlund incorporated Catholic values into all the subjects she taught. Because Ostlund's position is ministerial, CCS contends, the Department has no jurisdiction, no further inquiry is permitted into the reasons for Ostlund's termination, and the Department must dismiss her complaint.

¶ 10. Ostlund and LIRC respond that her position is not ministerial. In addition, in disagreement with the circuit court, they contend that the nature of Ostlund's claim and CCS's response are proper considerations in deciding whether adjudication of the complaint would infringe on CCS's First Amendment rights.

¶ 11. On an appeal of a circuit court decision reviewing an agency decision, we review the decision of the agency, not that of the circuit court. *Jocz*, 196 Wis. 2d at 289–90. We review de novo an administrative agency's conclusions of law regarding the scope of its own powers or subject matter jurisdiction to decide an issue. *Id.* at 291. We also review de novo an agency's conclusions of constitutional law. *See id.* at 304. In our review, we accept the findings of fact made by the agency if they are supported by substantial evidence in the record, and we do not substitute our judgment for that of the agency as to credibility or the weight of the evidence on any disputed finding. *Id.*

## I. Subject Matter Jurisdiction

■

¶ 12. CCS appears to frame the underlying issue as one of the Department's jurisdiction. However, as both LIRC and the circuit court correctly concluded, in *Jocz* we held that the free exercise clause of the First Amendment[3] does not "categorically deprive[] the Department of subject matter jurisdiction to review and investigate whether evidence supports a[n] . . . employment discrimination complaint filed against a religious association." *Id.* at 284. Nonetheless, even though the Department has the "legislatively created authority and jurisdiction," the First Amendment may preclude the Department from enforcing secular mandates against religious organizations. *Id.* at 296. We therefore frame the underlying issue as whether the First Amendment precludes the Department from adjudicating Ostlund's complaint.

## II. Relationship of Ministerial Exception to Reasons for Employment Decision

¶ 13. As a threshold matter we resolve the issue of whether we may consider the asserted reasons for the employment decision either as part of the application of the ministerial exception or as an alternative to deciding whether that exception applies.

¶ 14. Under the "ministerial exception," which we adopted in *Jocz*, "the Department[] is prevented from enforcing the state's employment discrimination laws

---

[3] The First Amendment to the United States Constitution provides that there shall be "no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. CONST. amend. I.

against religious associations when the employment position at issue serves a 'ministerial' or 'ecclesiastical'[4] function." *Id.* at 301 (footnote added). In adopting this exception, we followed *McClure v. Salvation Army*, 460 F. 2d 553, 560–61 (5th Cir. 1972), and *Rayburn v. General Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1167–70 (4th Cir. 1985), which held that the First Amendment's free exercise clause[5] precluded adjudicating Title VII complaints based on gender and race filed, respectively, by a minister and an applicant for a pastoral position against their churches.[6] As a "useful guide" we adopted the following test from *Rayburn*, 772 F.2d at 1169, to determine whether a position is ministerial or ecclesiastical: "As a general rule, if the employee's primary duties consist of teaching,[7] spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered

---

[4] Although we used the phrase "ministerial or ecclesiastical" throughout *Jocz v. LIRC*, 196 Wis. 2d 273, 538 N.W.2d 588 (Ct. App. 1995), we simplify in this opinion by using only the term "ministerial."

[5] The court in *Rayburn v. General Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1169–71 (4th Cir. 1985), undertook a separate analysis under the establishment clause and concluded that clause also precluded the lawsuit.

[6] Title VII, 42 U.S.C. 2000e-2000e-17, prohibits discrimination based on race, color, religion, sex, or national origin. *See* 42 U.S.C. 2000e-2(a)(1). Since *McClure*, the ministerial exception has been applied to a range of antidiscrimination and employee protection laws. *See* Caroline Mala Corbin, *Above the Law? The Constitutionality of the Ministerial Exemption from Antidiscrimination Law,* 75 Fordham L. Rev. 1965, 1975–76 (2007).

[7] Although the phrase "the faith" does not appear after "teaching," this is the only reading that makes sense, and this is how it is uniformly read.

['ministerial' or 'ecclesiastical']." *Jocz,* 196 Wis. 2d at 303 (alteration in original) (footnote added) (citations omitted). We concluded the position at issue in *Jocz*—director of field education at a Roman Catholic Seminary—fulfilled a ministerial function. *Id.* at 306.

¶ 15. LIRC and Ostlund argue that it is not necessary to determine whether Ostlund's position was ministerial because, even if it was, an adjudication of her complaint will not involve excessive entanglement by the State in matters of religious doctrine. This is so, they assert, because neither Ostlund nor CCS asserts that the reason for the nonrenewal of Ostlund's contract had a basis in religious doctrine.

¶ 16. This approach is inconsistent with *Jocz.* We held in *Jocz* that "[i]f the agency or court concludes that the position is 'ministerial' or 'ecclesiastical,' further enforcement of the WFEA against the religious association is constitutionally precluded, and the complaint should be dismissed." *Id.* at 302. In this ruling, we were following *McClure,* 460 F.2d at 560–61, and *Rayburn,* 772 F.2d at 1165, 1167–68. *See Jocz,* 196 Wis. 2d at 298–302. This is the prevailing view among the courts that have applied the ministerial exception: it bars adjudication of discrimination claims even if there is no religious justification for the alleged discrimination. *See* Shawna Meyer Eikenberry, *Thou Shalt Not Sue the Church: Denying Court Access to Ministerial Employees,* 74 IND. L.J. 269, 269 (1998).[8]

---

[8] A notable exception is *Bollard v. California Province of the Soc'y of Jesus,* 196 F.3d 940 (9th Cir. 1999). In *Bollard* a seminary student alleged a sexual harassment claim against his Jesuit superiors. *Id.* at 944. Because the religious order disavowed any religious justification for that conduct and the harassment claim did not involve a church's selection of its own clergy, the court rejected a strict application of the ministerial

¶ 17. LIRC points out that in *Sacred Heart School Bd. v. LIRC*, 157 Wis. 2d 638, 640, 460 N.W.2d 430 (Ct. App. 1990), we held that the First Amendment did not preclude the Department from holding a hearing on the age discrimination complaint of a Catholic elementary school teacher to determine whether the school's stated reasons for dismissal—which included the teacher's failure to maintain a "prayerful environment"—was a pretext for age discrimination. If the stated religiously-based reasons were determined not to be a pretext, we explained, the school was free to discharge her for those reasons. *Id.* at 643. We rejected the argument that investigating the complaint would lead to the entanglement found impermissible in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 503–04 (1979). *Sacred Heart*, 157 Wis. 2d at 643. We reasoned that the NLRB supervision involved in that case was "ongoing state scrutiny of employer/employee relations [whereas] . . . employment discrimination . . . involves only sporadic investigation of employee complaints." *Id.*

■

¶ 18. We do not agree with LIRC's suggestion that we may disregard *Jocz* and apply the analysis we used in *Sacred Heart*. The ministerial exception was not raised in *Sacred Heart*, and we addressed the entanglement argument that was raised. *Id.* The precise relationship between the ministerial exception and an

exception. *Id.* at 947. Instead the court employed a more flexible balancing test under the Free Exercise Clause and a similar balancing test under the Establishment Clause. *Id.* at 946–50. The court concluded that neither clause required a court to abstain from adjudicating the sexual harassment claim. *Id.* at 948, 950.

entanglement challenge based on *Catholic Bishop* is not clear in the case law.[9] However, we need not resolve that issue on this appeal. Because the ministerial exception precludes further inquiry into the reasons for the employment action, *Jocz*, 196 Wis. 2d at 301–02, 306–07, if the exception applies, we do not consider the stated reason for the employment action. On the other hand, if there is no contention before the court that the ministerial exception applies, as in *Sacred Heart*, or if the court determines it does not apply, *see, e.g., EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d

---

[9] There is not a uniform view on the constitutional source of the ministerial exception. Some courts, as we did in *Jocz*, 196 Wis. 2d at 284, treat the exception as derived from the free exercise clause. Other courts treat it as derived from the establishment clause, *see, e.g., EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1369 (9th Cir. 1986), or from both clauses. *See, e.g., Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006); *see also* Shawn Meyer Eikenberry, Thou Shalt Not Sue the Church: Denying Court Access to Ministerial Employees, 74 IND. L.J. 269, 273–76 (1998). And some courts do not specify the clause. *See* Corbin, *supra* note 6, at 1977–80. At least seven federal circuit courts of appeal have adopted the ministerial exception. *See Petruska v. Gannon Univ.*, 462 F.3d 294, 304 n.5 (3d Cir. 2006) (listing six other circuits with which it joins). However, the United States Supreme Court has never addressed the ministerial exception. Corbin, *supra* note 6, at 1968.

As for the entanglement challenge grounded in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), that case held there would be a significant risk of infringement of the religion clauses of the First Amendment if the National Labor Relations Act conferred jurisdiction over church–operated schools. The Court referred to the "religion clauses," not distinguishing between the free exercise clause and the establishment clause. *See generally Catholic Bishop*, 440 U.S. 490. However, it appears this entanglement analysis is viewed as arising from the Establishment Clause. *See* Corbin, *supra* note 6, at 1980.

277, 284–87 (5th Cir. 1981), then the court may take up an entanglement challenge.[10]

¶ 19. Because CCS has raised the ministerial exception, under *Jocz* the Department must first consider whether this exception applies. 196 Wis. 2d at 301–02. If the exception applies, the Department is precluded from enforcing the WFEA and must dismiss the complaint. *Id.* at 301–02, 306–07.

## III. Standard for Ministerial Exception

### A. The Primary Duties Guide

¶ 20. As noted above, in *Jocz* we adopted the "primary duties" test as a "useful guide" to determine whether a position is ministerial: "As a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered ['ministerial' or 'ecclesiastical']." *Id.* at 303 (alteration in original) (citations omitted). However, we emphasized it is not an exclusive test, and we stated: "While this test is not meant to provide the

---

[10] The cases LIRC and Ostlund cite in which other courts have concluded there would be no entanglement because of the stated reason for employment action fall into this latter category—either there was apparently no argument made that the ministerial exception applied, *see, e.g., EEOC v. Pacific Press Publ'g Ass'n*, 676 F.2d 1272 (9th Cir. 1982), or the court implicitly or explicitly rejected the ministerial exception. *See DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 172 (2nd Cir. 1993). The notable exception is *Bollard*, 196 F.3d at 948–51. However, in view of *Jocz*, we are not at liberty to adopt the approach of the *Bollard* court.

exclusive definition of 'ministerial' or 'ecclesiastical' functions, it should provide a basic framework for reviewing agencies or courts to follow when addressing the *prima facia* [sic] questions of whether a position is entitled to constitutional protection from state interference." *Id.*

¶ 21. The primary duties guide is helpful in that it lists broad categories of duties that are considered ministerial. However, it does not address the questions of how to determine when a particular duty falls within one of the broad categories and how to determine when the duties that fall within those categories are the primary duties of the employment position.

¶ 22. In this case, certain of Ostlund's duties plainly fall into the category of teaching the faith and the category of supervision or participation in religious ritual and worship. These duties are: teaching the religion class, leading her students in prayer, and helping them plan a liturgy several times a year. In addition, we assume without deciding that Ostlund's supervision of her students at weekly liturgies falls within the category of supervising or participating in religious ritual and worship.[11]

---

[11] The ALJ found that Ostlund's role during the weekly liturgies, at which a priest presided, was "to keep her students well-behaved." There was also a finding that she "supervised her students during their attendance at weekly liturgies." We conclude that "supervision or participation in religious ritual and worship" within the meaning of the primary duties guide requires, at a minimum, leadership or some other role of responsibility in the religious ritual and worship. It is not clear from the ALJ's findings what Ostlund's supervision at the weekly liturgies entailed. We assume without deciding that her duties did involve leadership or some other role of responsibility in religious ritual and worship.

¶ 23. CCS contends that, in addition to these specific duties, we must consider (1) the mission of Catholic schools, (2) their essential role in carrying out the pastoral mission of the Roman Catholic Church, (3) Ostlund's duty to model and support Catholic doctrine, and (4) her incorporation of Catholic values into all the subjects she taught. If we do so, CCS asserts, it is clear that her primary function is that of a minister.

¶ 24. We view the crux of the parties' dispute to be how broadly or narrowly we should construe the categories of activities contained in the primary duties guide and how we should determine what duties are primary.[12] Whether the duties that come within those categories are the primary duties of Ostlund's position, as we have already stated, the primary duties guide does not answer these questions.

¶ 25. We therefore examine *McClure* and *Rayburn* for additional guidance. We next consider a test used in the Fifth Circuit to determine when a position is ministerial. Finally, we consider cases that address the ministerial exception in a factual context similar to this.

### B. *McClure* and *Rayburn*

¶ 26. *McClure*, 460 F.2d 553, was apparently the first court to apply the ministerial exception. The *McClure* court based the exception on the principle, established in *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952), that religious associations must

---

[12] We recognize that the determination that Ostlund's primary duty was not religiously related is labeled as a finding of fact. *See* paragraph 5, *supra*. However, to the extent this determination involves the application of a legal standard for what is primary and what activities are religious, it is not a finding of fact on which we defer to the agency.

have the "power to decide for themselves, free from state interference, matters of church[13] government as well as those of faith and doctrine." *McClure*, 460 F.2d at 560. The *McClure* court reasoned that a church's relationship with its minister, "the chief instrument by which the church seeks to fulfill its purpose," was of "prime ecclesiastical concern." *Id.* at 559. It concluded that both the initial selection as well as salary and duties of a minister were matters of church government and administration and inquiry into those matters by government would be inconsistent with *Kedroff. Id.* at 559–60.

¶ 27. *Rayburn* provided a more elaborate analysis of the constitutional basis for the exception. The court first concluded that "[a]ny attempt by government to restrict a church's free choice of its leaders . . . constitutes a burden on the church's free exercise rights." *Rayburn*, 772 F.2d at 1168. Then, applying *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972), the court inquired "whether 'there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause.' " *Rayburn*, 772 F.2d at 1168. The court recognized the magnitude of assuring employment opportunities free of the proscribed discrimination, but concluded that in the case before it "[the] balance weighs in favor of the free exercise of religion." *Id.* However, the court recognized that the balance struck would be different for "the secular employment decisions of a religious institution," given that "Title VII is an interest of the highest order." *Id.* at 1169.

---

[13] Although in other contexts "church" is associated only with the Christian religion, in First Amendment case law "church" often means any organized religion.

347

¶ 28. We derive from *Rayburn* the significant principle that the ministerial exception properly overrides enforcement of discrimination claims only when the position is "quintessentially religious," because it is such a position that presents the prospect of making an "inroad on religious liberty" that is "too substantial to be permissible." *Id.* at 1169 (citations omitted).

## C. Fifth Circuit Three-Factor Test

¶ 29. Since *McClure* and *Rayburn*, courts have struggled to decide when a position is or is not ministerial on a case-by-case basis, and the results are often difficult to reconcile. *See* Janet S. Belcove-Shalin, *Ministerial Exception and Title VII Claims: Case Law Grid Analysis,* 2 Nev. L.J. 86, 115 (2002).[14] Some cases do not articulate a particular standard they are using; some use the primary duties test; and the Fifth Circuit has used an alternative three-factor test. *Starkman v. Evans,* 198 F.3d 173, 176–77 (5th Cir. 1999) (citing *Southwestern Baptist,* 651 F.2d at 283, 284).

¶ 30. In *Starkman,* citing to *Southwestern Baptist,* 651 F.2d at 283, 284, the court identified the relevant factors as: (1) whether the hiring decision was made " 'largely on religious criteria' "; (2) whether the individual was qualified and authorized to perform the ceremonies of the Church; and (3) "probably most important, . . . whether [the individual] 'engaged in

[14] *See also Hope Int'l Univ. v. Superior Court,* 14 Cal. Rptr. 3d 643, 653-55 (Cal. Ct. App. 2004), for that court's categorization of positions that have been considered ministerial: clergy; persons whose function is "essentially liturgical, that is, connected to the religious or worship service of the organization"; proselytizers or spokespeople on church's behalf; and the "harder" cases involving education, which fall into several subcategories.

activities traditionally considered ecclesiastical or religious.' " *Starkman*, 198 F.3d at 176–77. The second and third factors do not appear to add to the primary duties test. The third factor is a summary of all duties included in the primary duties test and the second factor is subsumed in the particular category of "supervision or participation in religious ritual and worship."[15] *See Jocz*, 196 Wis. 2d at 303. However, the first factor supplements the primary duties test by looking at the hiring criteria. In *Starkman* the court was persuaded the choir director occupied a ministerial position in part because she was required to have extensive course work in religion and church music in addition to a music degree. *Starkman*, 198 F.3d at 176.

¶ 31. We conclude that whether the hiring criteria for a position is "largely religious" is a useful factor to consider as a supplement to the primary duties test. The purpose of the ministerial exception is to avoid government interference with how a religion chooses its spiritual leaders. If the criteria for a position are "largely religious," the potential for interference is increased.

### D. Other School Cases

¶ 32. We next consider cases that have determined whether the ministerial exception applies to a lay teacher at a religious elementary or secondary

---

[15] Another court has described "[this] tripartite test" from the Fifth Circuit "[as] an expansion of the 'primary duties' test, which is subsumed by its third prong." *Patsakis v. Greek Orthodox Archdiocese*, 339 F. Supp. 2d 689, 695 (W.D. Pa. 2004). We do not view as significant this different way of looking at the relationship between the two tests.

school who teaches subjects other than religion.[16] In all but one of the cases the parties provide or we have found, the courts conclude the ministerial exception does not apply in this context. *See EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1369–70 (9th Cir. 1986) (teachers in an elementary and high school who must subscribe to specific tenets of faith are not ministerial employees because they do not fulfill the function of a minister); *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1392, 1396 (4th Cir. 1990) (teachers in an elementary and high school that include Bible study instruction and biblical material integrated into secular academic subjects are not ministerial employees because

---

[16] We confine our discussion to cases that involve enforcement of employment discrimination laws or other employee protection laws such as Fair Labor Standards Act, 29 U.S.C. §§ 201–219, and Equal Pay Act, 29 U.S.C. § 206(d). We do not include cases involving teachers in colleges and universities except to note two significant cases that are fairly representative. In *EEOC v. Mississippi College*, 626 F.2d 477, 479, 485 (5th Cir. 1980), the court held that a position teaching a secular subject—psychology—was not ministerial because the faculty members were

> not intermediaries between the church and its congregation[,] . . . [did not] attend to the religious needs of the faithful nor instruct students in the whole of the religious doctrine[;] [t]hat faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern.

On the other hand, where the position was that of teaching canon law, the " 'fundamental body of ecclesiastical laws' " of the Roman Catholic Church, the court found it to be ministerial because that faculty "serve as the instruments established by the Catholic Church in the United States for teaching its doctrines and disciplines." *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 457, 464 (D.C. Cir 1996).

350

they do not perform sacerdotal functions, serve as church governors, or belong to a religious order);[17] *Redhead v. Conference of Seventh-Day Adventists*, 440 F. Supp. 2d 211, 214, 221 (E.D. N.Y. 2006) (elementary teacher of secular subjects except religion for one hour a day, who attended religious ceremonies once a year with students, did not hold a ministerial position because her primary duties were secular rather than religious); *Guinan v. Roman Catholic Archdiocese of Indianapolis*, 42 F. Supp. 2d 849, 850–52 (S.D. Ind. 1998) (elementary teacher who taught, in addition to secular subjects, one or more religious courses, was a "Catechist,"[18] and planned a mass once a month in which her students participated was not a ministerial employee; notwithstanding that a primary objective of the school was the religious education and spiritual development of the students and that she perceived one of her principal duties to be "an example of Christianity," because the great majority of her duties was

---

[17] In *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1395–96 (4th Cir.1990), the court addressed the ministerial exemption of the Fair Labor Standards Act, which derived from the congressional debate and was delineated in agency guidelines. However, the *Dole* court cited to *Rayburn* to explain the scope of the exemption. *Id.* at 1396. Subsequently the Fourth Circuit Court of Appeals pointed out that in *Dole* it had looked to *Rayburn* to define the scope of the ministerial exemption, and it held that the constitutional ministerial exemption of *Rayburn* and the FLSA ministerial exemption were co-extensive in scope. *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 306 (4th Cir. 2004). We therefore consider the analysis in *Dole* to be relevant to this appeal.

[18] The teacher in *Guinan v. Roman Catholic Archdiocese of Indianapolis*, 42. F. Supp. 2d 849, 850 n.2 (S.D. Ind. 1998), was considered a "Catechist" because she had attended a Catholic college and taken eighteen hours of theology.

teaching secular courses) (footnote added); *EEOC v. Tree of Life Christian Sch.*, 751 F. Supp. 700, 702, 706 (S.D. Ohio 1990) (teachers and administrators at preschool, elementary and secondary school do not come within the ministerial exception although they view their primary responsibility as inculcating the Christian religion in the students);[19] *see also Gallo v. Salesian Soc'y, Inc.*, 676 A.2d 580, 590–92 (N.J. Super. Ct. App. Div. 1996) (secondary English and history teacher did not perform a ministerial function even though her contract required that she exemplify Christian principles in all her teaching, each class began with a prayer, and the school had a religious purpose and philosophy).[20]

---

[19] *EEOC v. Tree of Life Christian School*, 751 F. Supp. 700, 706 (S.D. Ohio 1990), addressed the ministerial exception to the F.L.S.A., while citing to *Rayburn*. We therefore consider it, like *Dole*, to be relevant to our analysis. *See supra* note 17.

[20] LIRC and Ostlund cite additional cases in which courts have concluded that the First Amendment does not preclude adjudicating employment discrimination claims by lay teachers with some religious responsibilities at sectarian schools— *DeMarco v. Holy Cross High School*, 4 F.3d 166, 168, 172 (2d Cir. 1993), and *Geary v. Visitation of the Blessed Virgin Mary Parish School*, 7 F.3d 324, 331 (3d Cir. 1993). *See also Dolter v. Wahlert High Sch.*, 483 F. Supp. 266, 270–71 (N.D. Iowa 1980). However, these cases focus, as we did in *Sacred Heart Sch. Bd. v. LIRC*, 157 Wis. 2d 638, 643, 460 N.W.2d 430 (1990), on whether there would be excessive entanglement under *Catholic Bishop*, 440 U.S. at 503–04, if the court adjudicated the claims. It may be that the courts in *DeMarco* and *Geary* implicitly decided that the ministerial exception did not apply to the facts before them and that is why they undertook an entanglement analysis. *See DeMarco*, 4 F.3d at 172 ("There may be cases involving lay employees in which the relationship between employee and employer is so pervasively religious that it is impossible to engage in an age-discrimination inquiry without serious risk of offending the Establishment Clause. This is not such a case.");

¶ 33. In contrast, the court in *Stately v. Indian Cmty. Sch. of Milwaukee, Inc.*, 351 F. Supp. 2d 858, 869 (E.D. Wis. 2004), on which CCS relies, dismissed a complaint by a teacher in a Native American school after concluding she had been hired in a ministerial role. In *Stateley* the school moved to dismiss on the ground the court lacked jurisdiction because the teacher had held a ministerial position.[21] *Id.* at 862. The teacher had the burden to establish jurisdiction, but did not respond to the school's motion. *Id.* at 866. The court's conclusion was therefore qualified: "[The school's] arguments, while not unassailable, fairly cast jurisdiction into doubt. Because [the teacher] has not responded to [the school's] motion[,] . . . based on *this* record, the Court cannot say it has jurisdiction to hear this case." *Id.* (emphasis in original). Based on the record before it the court concluded the teacher was hired to act in a ministerial role because the school required all its teachers to integrate Native American culture and religion into their classes, she participated in and at times assumed a leadership role in religious ceremonies, and she served as a mentor in a spiritually based program. *Id.* at 869.

¶ 34. *Stately* lends some support to the proposition that teaching secular subjects by incorporating religious doctrine, may, along with other religious du-

---

*Geary*, 7 F.3d at 331 (distinguishing the case before it, in terms of entanglement, from those that involve clergy or religious leaders). However, because *DeMarco* and *Geary* do not separately analyze the ministerial exception and explain why it does not apply, they do not provide guidance in analyzing the application of the exemption in this case.

[21] The moving party and the court in *Stately v. Indian Cmty. Sch. of Milwaukee, Inc.*, 351 F. Supp. 2d 858, 866 (E.D. Wis. 2004), treated the First Amendment challenge as precluding the court from having subject matter jurisdiction over the case.

ties, constitute a ministerial role. However, it is not clear in *Stately* what secular subjects the plaintiff taught, if any, or what she did to incorporate religion into the teaching of secular subjects.[22]

¶ 35. These cases show that, with the possible exception of *Stately*, courts implicitly or explicitly reject the proposition that the religious mission of the school and its teachers makes the teachers' positions ministerial. *See, e.g., Tree of Life*, 751 F. Supp. at 706; *Dole*, 899 F.2d at 1392, 1396. These cases also show that a teacher's duty to serve as a model and support of particular religious values is not viewed as a ministerial function. *Guinan*, 42. F. Supp. 2d at 852 n.6; *Gallo*, 676 A.2d at 588; *EEOC v. Mississippi College*, 626 F.2d 477, 485 (5th Cir. 1980).

---

[22] CCS cites two other cases in which courts have found that teachers at a religious elementary or secondary school perform ministerial functions, but we conclude they are too factually different to be relevant here. *Powell v. Stafford*, 859 F. Supp. 1343, 1345 (D. Colo. 1994), involved a high school teacher who taught only theology, instructing the students in Roman Catholic doctrine, with prayer as a component of the instruction. The court concluded that this was a ministerial position, noting that his duties were "exclusively religious." *Id.* at 1347. There is no question here that Ostlund's duties are not "exclusively religious."

In the second case, *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 797 (4th Cir. 2000), the position at issue was that of a part-time minister of music for the church and part-time teacher of music for the church-operated school. The court's opinion that both parts of the position were ministerial turned on its determination of the central importance of music in the liturgy and mass and in conveying the church's religious message—both at the church and at the school. *Id.* at 802. This is not an apt analogy to Ostlund's duties.

## IV. Application of Ministerial Exception To This Case

██

¶ 36. We conclude that Ostlund's position is not ministerial for the following reasons. First, while we do not question the importance of St. Patrick's Elementary School to the religious mission of the Catholic Church or to the religious mission of the school and its teachers, we agree with the cases we have discussed above that these factors do not in themselves make Ostlund's position ministerial. All church-operated schools undoubtedly have a religious purpose that is integral to the mission of the church. In our view, the ministerial exception must focus on the specific duties of the position at issue within the religious school in order to determine "the prospect of inroads on religious liberty" if discrimination laws are enforced with respect to that position. The prospect of such inroads is central to determining how the balance should be struck between the Free Exercise Clause and laws prohibiting discrimination. *See Rayburn,* 772 F.2d at 1169. A general exemption for teachers in religious schools would be more expansive than warranted when considered in light of the magnitude of the State's interest in the enforcement of antidiscrimination laws.

¶ 37. Second, similar to other courts, we conclude that a religious teacher's duty to model and support particular religious values is not in itself one of the duties included in the primary duties guide: it does not constitute teaching or spreading the faith within the meaning of that guide. We do not question the dedication of teachers in religious schools to fulfilling this role. However, the duties in the guide are intended to distinguish, from other employees of churches or religious organizations, those persons whose relation-

ship to the church or organization is such that employment decisions regarding them will likely involve ecclesiastical decisions or matters of church government, faith and doctrine. *See Jocz*, 196 Wis. 2d at 303. Modeling and supporting religious values does not provide a distinction that serves this purpose.

¶ 38. Third, even if in some cases the teaching of secular subjects might be so infused with religious doctrine that it would constitute the teaching of the faith, we are persuaded that is not the case here. The ALJ found that the textbooks used in the subjects, besides religion, were non-religious. The only specific finding of religious content in the courses, besides religion, were a "Christmas around the world" unit in social studies and occasional use of religious symbols to illustrate math concepts. The ALJ also found that in Ostlund's own comments on her job evaluation, she stated that she had "often taken class time to discuss honesty, fairness, and following rules to help the children learn self-discipline and develop morals and values."[23] We have reviewed the record cites, provided by

---

[23] The religious atmosphere portion Ostlund completed in May 2002 read as follows:

Quality of Teaching and Job Performance

1. RELIGIOUS ATMOSPHERE

Teacher comments

I have tried very hard to provide a strong Christian model for my students. I have taught religion daily and prepared liturgies which are well thought out and appropriate for first graders. I have actively involved and encouraged every single child in my class in mass participation by reading, offering gifts, and shaking hands. I have often taken class time to discuss honesty, fairness, and following rules to help the children learn self discipline and develop morals and values.

Administrator/Evaluator comments

CCS, of other statements by Ostlund, and they are consistent with this job evaluation statement: she is not referring to specific Catholic doctrine but to values that are shared by many persons who are not Catholic. We conclude this does not constitute teaching the faith within the meaning of the primary duties guide.[24]

¶ 39. Fourth, with the above conclusions in mind, when we apply the primary duties guide, supplemented by consideration of the hiring criteria, we conclude that the duties included within that guide are not Ostlund's primary duties. The religion class, prayers, and participation with her students in liturgies do not constitute the primary part of her work day and they are not the primary focus either of the job description or the job evaluation. There is no dispute that when Ostlund was hired she had a bachelors degree in physical education and no religious courses in college. The ALJ found that it was not a requirement for the teachers at St. Patrick's to be members of any religious order of the Catholic

---

Wendy is the initial teacher of formal religious instruction for many of our students, as most go to a public kindergarten, so she teaches them prayers, religion instruction from their text as well as supply much supplemental instruction. [sic]

She encourages her students to develop an inner discipline and a life-style of caring fellowship. She prepares students for participation in liturgies and prayer services celebrated during the school year.

Wendy is a registered member of St. Patrick's Parish.

The remainder of the evaluation concerned the other three main categories of the job description—teaching, supervising, and professional responsibilities—none of which included reference to religious matters.

[24] CCS also points to the religious symbols that Ostlund had in her class room. However, CCS does not direct us to any evidence that these were involved in the teaching of subjects other than the religion class.

Church. There is no evidence that there were any religious criteria for Ostlund to obtain the job, although there was required in-service religious training for all elementary teachers. The ALJ found that the relevant revised standards required the diocese's basic certification in religion for all teachers, advanced certification for those, like Ostlund, who taught religion in Catholic elementary schools; and an academic minor in religion for those teaching full-time in Catholic elementary schools. We conclude the hiring and in-service criteria support the conclusion that, while Ostlund had religious duties, they were not her primary duties.

¶ 40. Fifth, we conclude that not applying the ministerial exception in this case is consistent with the fundamental purpose of the exception. Because Ostlund's primary duties do not implicate matters of Church faith and doctrine, the prospect that employment decisions will implicate those matters is significantly diminished. This, in turn, affects the balance between the free exercise right and the important policies underlying the WEFA. We are persuaded that a bar to adjudication of Ostlund's discrimination claim is not warranted based on the nature of her position.

¶ 41. We emphasize that our conclusion that Ostlund's position is not ministerial does not mean that CCS would have no First Amendment protection if an employment decision concerning her *did* implicate a matter of Church faith or doctrine. As we have discussed above in paragraph 18, a challenge based on entanglement because of the reason asserted by the claimant or the respondent is available even if the ministerial exception does not apply. However, the

reasons asserted here do not appear to implicate any Roman Catholic faith or doctrine and CCS does not contend otherwise.[25]

## CONCLUSION

¶ 42. We conclude that the ministerial exception does not apply to Ostlund's position. CCS does not argue that there is any other First Amendment bar to adjudicating Ostlund's claim. We therefore affirm.

*By the Court.*—Order affirmed.

---

[25] CCS argues that we must defer to its view that Ostlund occupies a ministerial position, citing to *Jocz.* In *Jocz* we said:

> "[W]hile a church may regard the conduct of certain functions as integral to its mission, a court may disagree." *Corporation of Presiding Bishop [of Jesus of Latter Day Saints v. Amos]*, 483 U.S. [327,] 343 [(1987)] (Brennan, J., concurring). Accordingly, as one commentator has suggested, a court making "the key 'determination [of] whether an activity is religious or secular' must give considerable, if not decisive, weight to the religion's own vision of the distinction." STEPHEN L. CARTER, THE CULTURE OF DISBELIEF: HOW AMERICAN LAW AND POLITICS TRIVIALIZE RELIGIOUS DEVOTION 142–43 (Anchor Books ed., 1994) (citation omitted). Nonetheless, a religious association's designation of an employment position as "ministerial" does not necessarily "control [its] extra-religious legal status." [*Southwestern Baptist*], 651 F.2d at 283.

*Jocz,* 196 Wis. 2d at 302–03 (footnote omitted.)

Whatever the precise nature of the deference we referred to in *Jocz,* it is the role of the court to decide, after carefully considering the evidence the church or religious organization presents, whether the position at issue comes within the ministerial exception.