Justice Alito,
with whom Justice Kagan joins,
concurring.
I join the Court’s opinion, but I write separately to clarify my understanding of the significance of formal ordination and designation as a “minister” in determining whether an “employee”[1] of a religious group falls within the so-called “ministerial” exception. The term “minister” is commonly used by many Protestant denominations to refer to members of their clergy, but the term is rarely if ever used in this way by Catholics, Jews, Muslims, Hindus, or Buddhists.[2] In addition, the concept of ordination as understood by most Christian churches and by Judaism has no clear counterpart in some Christian denominations and some other religions. Because virtually every religion in the world is represented in the population of the United States, it would be a mistake if the term “minister” or the concept of ordination were viewed as central to the important issue of religious auton­omy that is presented in cases like this one. Instead, courts should focus on the function performed by persons who work for religious bodies.
*199 The First Amendment protects the freedom of religious groups to engage in certain key religious activities, including the conducting of worship services and other religious cere­monies and rituals, as well as the critical process of communi­cating the faith. Accordingly, religious groups must be free to choose the personnel who are essential to the performance of these functions.
The “ministerial” exception should be tailored to this pur­pose. It should apply to any “employee” who leads a reli­gious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or teacher of its faith. If a religious group believes that the ability of such an employee to perform these key functions has been compromised, then the constitutional guarantee of religious freedom protects the group’s right to remove the employee from his or her position.
I
Throughout our Nation’s history, religious bodies have been the preeminent example of private associations that have “act[ed] as critical buffers between the individual and the power of the State.” Roberts v. United States Jaycees, 468 U. S. 609, 619 (1984). In a case like the one now before us — where the goal of the civil law in question, the elimina­tion of discrimination against persons with disabilities, is so worthy — it is easy to forget that the autonomy of religious groups, both here in the United States and abroad, has often served as a shield against oppressive civil laws. To safe­guard this crucial autonomy, we have long recognized that the Religion Clauses protect a private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs. The Constitution guarantees reli­gious bodies “independence from secular control or manipu­lation — in short, power to decide for themselves, free from state interference, matters of church government as well as *200 those of faith and doctrine.” Kedroff v. Saint Nicholas Ca­thedral of Russian Orthodox Church in North America, 344 U. S. 94, 116 (1952).
Religious autonomy means that religious authorities must be free to determine who is qualified to serve in positions of substantial religious importance. Different religions will have different views on exactly what qualifies as an impor­tant religious position, but it is nonetheless possible to iden­tify a general category of “employees” whose functions are essential to the independence of practically all religious groups. These include those who serve in positions of lead­ership, those who perform important functions in worship services and in the performance of religious ceremonies and rituals, and those who are entrusted with teaching and con­veying the tenets of the faith to the next generation.
Applying the protection of the First Amendment to roles of religious leadership, worship, ritual, and expression fo­cuses on the objective functions that are important for the autonomy of any religious group, regardless of its beliefs. As we have recognized in a similar context, “[fjorcing a group to accept certain members may impair [its ability] to express those views, and only those views, that it intends to express.” Boy Scouts of America v. Dale, 530 U. S. 640, 648 (2000). That principle applies with special force with re­spect to religious groups, whose very existence is dedicated to the collective expression and propagation of shared reli­gious ideals. See Employment Div., Dept, of Human Re­sources of Ore. v. Smith, 494 U. S. 872, 882 (1990) (noting that the constitutional interest in freedom of association may be “reinforced by Free Exercise Clause concerns”). As the Court notes, the First Amendment “gives special solicitude to the rights of religious organizations,” ante, at 189, but our expressive-association cases are nevertheless useful in point­ing out what those essential rights are. Religious groups are the archetype of associations formed for expressive pur­poses, and their fundamental rights surely include the free­ *201 dom to choose who is qualified to serve as a voice for their faith.
When it comes to the expression and inculcation of reli­gious doctrine, there can be. no doubt that the messenger matters. Religious teachings cover the gamut from moral conduct to metaphysical truth, and both the content and credibility of a religion’s message depend vitally on the char­acter and conduct of its teachers. A religion cannot depend on someone to be an effective advocate for its religious vision if that person’s conduct fails to live up to the religious pre­cepts that he or she espouses. For this reason, a religious body’s right to self-governance must include the ability to select, and to be selective about, those who will serve as the very “embodiment of its message” and “its voice to the faithful.” Petrusha v. Gannon Univ., 462 F. 3d 294, 306 (CA3 2006). A religious body’s control over such “employ­ees” is an essential component of its ireedom to speak in its own voice, both to its own members and to the outside world.
The connection between church governance and the free dissemination of religious doctrine has deep roots in our legal tradition:
“The right to organize voluntary religious associations to assist in the expression and dissemination of any reli­gious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individ­ual members, congregations, and officers within the gen­eral association, is unquestioned. All who unite them­selves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed.” Watson v. Jones, 13 Wall. 679, 728-729 (1872).
*202 The “ministerial” exception gives concrete protection to the free “expression and dissemination of any religious doc­trine.” The Constitution leaves it to the collective con­science of each religious group to determine for itself who is qualified to serve as a teacher or messenger of its faith.
I — I ⅜-H
A
The Court’s opinion today holds that the “ministerial” ex­ception applies to Cheryl Perich (hereinafter respondent), who is regarded by the Lutheran Church — Missouri Synod as a commissioned minister. But while a ministerial title is undoubtedly relevant in applying the First Amendment rule at issue, such a title is neither necessary nor sufficient. As previously noted, most faiths do not employ the term “minis­ter,” and some eschew the concept of formal ordination.[3] And at the opposite end of the spectrum, some faiths con­sider the ministry to consist of all or a very large percentage of their members.[4] Perhaps this explains why, although every circuit to consider the issue has recognized the “minis­terial” exception, no circuit has made ordination status or formal title determinative of the exception’s applicability. The Fourth Circuit was the first to use the term “ministe­rial exception,” but in doing so it took pains to clarify that the label was a mere shorthand. See Rayburn v. General Conference of Seventh-day Adventists, 772 F. 2d 1164, 1168 *203 (1985) (noting that the exception’s applicability “does not de­pend upon ordination but upon the function of the position”). The Fourth Circuit traced the exception back to McClure v. Salvation Army, 460 F. 2d 553 (CA5 1972), which invoked the Religion Clauses to bar a Title VII sex-discrimination suit brought by a woman who was described by the court as a Salvation Army “minister,” id., at 554, although her actual title was “officer.” See McClure v. Salvation Army, 323 F. Supp. 1100, 1101 (ND Ga. 1971). A decade after McClure, the Fifth Circuit made clear that formal ordination was not necessary for the “ministerial” exception to apply. The court held that the members of the faculty at a Baptist semi­nary were covered by the exception because of their reli­gious function in conveying church doctrine, even though some of them were not ordained ministers. See EEOC v. Southwestern Baptist Theological Seminary, 651 F. 2d 277 (1981).
The functional consensus has held up over time, with the D. C. Circuit recognizing that “[t]he ministerial exception has not been limited to members of the clergy.” EEOC v. Cath­olic Univ., 83 F. 3d 455, 461 (1996). The court in that case rejected a Title VII suit brought by a Catholic nun who claimed that the Catholic University of America had denied her tenure for a canon-law teaching position because of her gender. The court noted that “members of the Canon Law Faculty perform the vital function of instructing those who will in turn interpret, implement, and teach the law govern­ing the Roman Catholic Church and the administration of its sacraments. Although Sister McDonough is not a priest, she is a member of a religious order who sought a tenured professorship in a field that is of fundamental importance to the spiritual mission of her Church.” Id., at 464. See also Natal v. Christian and Missionary Alliance, 878 F. 2d 1575, 1578 (CA1 1989) (stating that “a religious organization’s fate is inextricably bound up with those whom it entrusts with the responsibilities of preaching its word and ministering to *204 its adherents,” and noting “the difficulties inherent in sepa­rating the message from the messenger”).
The Ninth Circuit too has taken a functional approach, just recently reaffirming that “the ministerial exception encom­passes more than a church’s ordained ministers.” Alcazar v. Corporation of Catholic Archbishop of Seattle, 627 P. 3d 1288,1291 (2010) (en banc); see also Elvig v. Calvin Presbyte­rian Church, 375 F. 3d 951, 958 (2004). The Court’s opinion today should not be read to upset this consensus.
B
The ministerial exception applies to respondent because, as the Court notes, she played a substantial role in “convey­ing the Church’s message and carrying out its mission.” Ante, at 192. She taught religion to her students four days a week and took them to chapel on the fifth day. She led them in daily devotional exercises, and led them in prayer three times a day. She also alternated with the other teach­ers in planning and leading worship services at the school chapel, choosing liturgies, hymns, and readings, and compos­ing and delivering a message based on Scripture.
It makes no difference that respondent also taught secular subjects. While a purely secular teacher would not qualify for the “ministerial” exception, the constitutional protection of religious teachers is not somehow diminished when they take on secular functions in addition to their religious ones. What matters is that respondent played an important role as an instrument of her church’s religious message and as a leader of its worship activities. Because of these important religious functions, Hosanna-Tabor had the right to decide for itself whether respondent was religiously qualified to re­main in her office.
Hosanna-Tabor discharged respondent because she threat­ened to file suit against the church in a civil court. This threat contravened the Lutheran doctrine that disputes among Christians should be resolved internally without re­ *205 sort to the civil court system and all the legal wrangling it entails.[5] In Hosanna-Tabor’s view, respondent’s disregard for this doctrine compromised her religious function, disqual­ifying her from serving effectively as a voice for the church’s faith. Respondent does not dispute that the Lutheran Church subscribes to a doctrine of internal dispute resolu­tion, but she argues that this was a mere pretext for her firing, which was really done for nonreligious reasons.
For civil courts to engage in the pretext inquiry that re­spondent and the Solicitor General urge us to sanction would dangerously undermine the religious autonomy that lower court ease law has now protected for nearly four decades. In order to probe the real reason for respondent’s firing, a civil court — and perhaps a jury — would be required to make a judgment about church doctrine. The credibility of Hosanna-Tabor’s asserted reason for terminating respond­ent’s employment could not be assessed without taking into account both the importance that the Lutheran Church at­taches to the doctrine of internal dispute resolution and the degree to which that tenet compromised respondent’s reli­gious function. If it could be shown that this belief is an obscure and minor part of Lutheran doctrine, it would be much more plausible for respondent to argue that this doc­trine was not the real reason for her firing. If, on the other hand, the doctrine is a central and universally known tenet of Lutheranism, then the church’s asserted reason for her discharge would seem much more likely to be nonpretextual. But whatever the truth of the matter might be, the mere adjudication of such questions would pose grave problems *206 for religious autonomy: It would require calling witnesses to testify about the importance and priority of the religious doctrine in question, with a civil factfinder sitting in ultimate judgment of what the accused church really believes, and how important that belief is to the church’s overall mission.
At oral argument, both respondent and the United States acknowledged that a pretext inquiry would sometimes be prohibited by principles of religious autonomy, and both con­ceded that a Roman Catholic priest who is dismissed for get­ting married could not sue the church and claim that his dis­missal was actually based on a ground forbidden by the federal antidiscrimination laws. See Tr. of Oral Arg. 38-39, 50. But there is no principled basis for proscribing a pre­text inquiry in such a case while permitting it in a case like the one now before us. The Roman Catholic Church’s insist­ence on clerical celibacy may be much better known than the Lutheran Church’s doctrine of internal dispute resolution, but popular familiarity with a religious doctrine cannot be the determinative factor.
What matters in the present case is that Hosanna-Tabor believes that the religious function that respondent per­formed made it essential that she abide by the doctrine of internal dispute resolution; and the civil courts are in no po­sition to second-guess that assessment. This conclusion rests not on respondent’s ordination status or her formal title, but rather on her functional status as the type of em­ployee that a church must be free to appoint or dismiss in order to exercise the religious liberty that the First Amend­ment guarantees.

 It is unconventional to refer to many persons who clearly fall within the “ministerial” exception, such as Protestant ministers, Catholic priests, and Jewish rabbis, as “employees,” but I use the term in the sense in which it is used in the antidiscrimination laws that are often implicated in cases involving the exception. See, e. g., 42 U. S. C. §2000e(f) (Title VII); §12111(4) (Americans with Disabilities Act of 1990); 29 U. S. C. § 630(f) (Age Discrimination in Employment Act); § 206(e) (Equal Pay Act and Fair Labor Standards Act).

 See 9 Oxford English Dictionary 818 (2d ed. 1989) (def. 4(b)) (noting the term “minister” used in various phrases “applied as general designa­tions for a person officially charged with spiritual functions in the Chris­tian Church”); 9 Encyclopedia of Religion 6044-6045 (2d ed. 2005). See also, e. g., 9 New Catholic Encyclopedia 870 (1967).

 In Islam, for example, “every Muslim can perform the religious rites, so there is no class or profession of ordained clergy. Yet there are reli­gious leaders who are recognized for their learning and their ability to lead communities of Muslims in prayer, study, and living according to the teaching.of the Qur’an and Muslim law.” 10 Encyclopedia of Religion 6858 (2d ed. 2005).

 For instance, Jehovah’s Witnesses consider all baptized disciples to be ministers. See The Watchtower, Who Are God’s Ministers Today? Nov. 15, 2000, p. 16 (“According to the Bible, all Jehovah’s worshippers — heav­enly and earthly — are ministers”).

 See The Lutheran Church-Missouri Synod, Commission on Theology and Church Relations, 1 Corinthians 6:1-11: An Exegetical Study, p. 10 (Apr. 1991) (stating that instead of suing each other, Christians should seek “an amicable settlement of differences by means of a decision by fellow Christians”). See also 1 Corinthians 6:1 (“If any of you has a dis­pute with another, dare he take it before the ungodly for judgment instead of before the saints?”).