# IN THE COURT OF APPEALS OF TENNESSEE
## AT MEMPHIS
### April 17, 2012 Session

## CAROL PETSCHONEK v. THE CATHOLIC DIOCESE OF MEMPHIS, ET AL.

### Appeal from the Circuit Court for Shelby County
### No. CT-002485-07     Donna Fields, Judge

### No. W2011-02216-COA-R9-CV - Filed May 23, 2012

Defendant employer moved for summary judgment in this common law retaliatory discharge action on the grounds that Plaintiff employee was not an employee-at-will and that Plaintiff had failed to identify any law or clear public policy allegedly violated by Defendant. The trial court denied the motion. We granted permission for interlocutory appeal. On appeal, Defendant raises the issue of whether the courts lack jurisdiction under the ministerial exception. We hold that the court has subject matter jurisdiction. We also hold that Plaintiff was not an at-will employee, and therefore cannot establish a *prima facie* case of common law retaliatory discharge. The trial court's judgment denying Defendant's motion for summary judgment is reversed.

### Tenn. R. App. P. 9 Interlocutory Appeal by Permission; Judgment of the Circuit Court Reversed and Remanded

DAVID R. FARMER, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, J., joined. HOLLY M. KIRBY, J., filed a concurring opinion.

John H. Dotson and Allison Wannamaker, Memphis, Tennessee, for the appellants, The Catholic Diocese of Memphis and Church of the Incarnation School.

Dan N. Norwood and Steven W. Barnat, Memphis, Tennessee, for the appellee, Carol Petschonek.

## OPINION

This interlocutory appeal under Rule 9 of the Tennessee Rules of Appellate Procedure arises from the trial court's denial of Defendant/Employer's motion for summary judgment in a common law retaliatory discharge action. The issues certified for appeal, as we state

them, are:

(1)     Whether the trial court erred by determining that an employment at-will relationship existed where Plaintiff was employed under a written contract of employment for a definite term that contained a termination clause permitting discharge without cause.

(2)     Whether Plaintiff identified an illegal activity or violation of clear public policy on the part of Defendant employer with sufficient specificity to establish a *prima facie* case of common law retaliatory discharge.

Defendants, the Church of the Incarnation School and the Catholic Diocese of Memphis, also assert, for the first time on appeal, that the courts lack subject matter jurisdiction over this matter under the ministerial exception doctrine.

### *Standard of Review*

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review the trial court's disposition of a motion for summary judgment *de novo*, with no presumption of correctness. *Mills v. Fulmarque, Inc.,* 60 S.W.3d 362, 366 (Tenn. 2012).

### *Background*

Plaintiff Carol Petschonek (Ms. Petschonek) was employed by the Church of the Incarnation School ("ICS"), which is operated by the Catholic Diocese of Memphis, for twelve years. She served as assistant principal for the 2005-2006 academic year, and as principal from June 10, 2006, through May 28, 2008. On May 20, 2009, Ms. Petschonek filed a complaint against ICS and the Catholic Diocese of Memphis (collectively, "the Diocese") in the Circuit Court for Shelby County, asserting claims for common law retaliatory discharge and statutory retaliatory discharge in violation of Tennessee Code Annotated § 50-1-304. In her complaint, Ms. Petschonek alleged that the Diocese terminated her employment in retaliation for her refusal to participate in or remain silent about what she believed was the misuse of funds raised by parents to purchase computer equipment, software, and related licenses for student use. She alleged that parents had helped to raise more than $50,000 in the previous two years, and that those funds were "earmarked largely to help fund the school's technology and security goals." She further alleged that the funds

-2-

were not used for that purpose, but that the Chief Financial Officer ("CFO") instead directed that the funds be used to pay other debts. Ms. Petschonek asserted that she had a reasonable cause to believe that this constituted fraud or a deceptive practice which would constitute an illegal activity. She asserted that on April 14, 2008, she was informed that her employment would end on June 10, 2008, but that on May 29, she was told to pack her things immediately and turn in her key. She further asserted that the only reason she had been given for the termination of her employment was a "loss of confidence in her leadership," and that this was a "mere pretext for discharging her in retaliation for her refusal to remain silent about or participate in an activity she had reasonable cause to believe was illegal."

The Diocese answered in August 2009, denying allegations of wrong-doing. The Diocese admitted that on April 14, 2008, Ms. Petschonek was informed that her annual contract, which ended on June 10, 2008, would not be renewed. The Diocese also admitted that Ms. Petschonek was relieved of her duties on May 29, 2008, but asserted that she was compensated through the end of her contractual term, June 10, 2008. The Diocese asserted that Ms. Petschonek had failed to state a claim where the allegations set forth in her complaint did not establish a *prima facie* claim for retaliatory discharge under Tennessee Code Annotated § 50-1-304 or under the common law. The Diocese filed a motion to dismiss for failure to state a claim in October 2009. The Diocese asserted that Ms. Petschonek was not an at-will employee, but was employed under an annual contract of employment for a definite term. It further asserted that Ms. Petschonek had failed to allege facts with respect to her assertion that she failed to remain silent about alleged illegal activities, and that she failed to identify any law or public policy allegedly violated by the Diocese. The Diocese also asserted that Ms. Petschonek had failed to allege any facts that would demonstrate a retaliatory motive.

Ms. Petschonek filed an amended complaint on March 19, 2010. In her amended complaint, Ms. Petschonek asserted that, although the terms of her employment were included in a employment agreement, she was nevertheless an employee at-will where the agreement specifically stated that she could be discharged at any time, with or without cause. She further asserted that, as principal of ICS, she had authority to purchase goods and services necessary for the school; that the Home and School Association ("HSA") had raised more than $50,000 for the sole purpose of technology and security purchases; and that in May 2007 she had made purchases endorsed by the school advisory board which were to be paid for with the funds raised by the HSA. She alleged that Diocese's CFO, Michael Pelech (Mr. Pelech), refused to pay the invoices submitted by the vendors, and that in June 2007 email conversation ensued between her and Mr. Pelech concerning the obligation to pay for the computer equipment. She further asserted that she sent copies of her correspondence to the Parish Pastor, Father William Parham ("Father Parham") and the Diocese's Superintendent of Schools, Dr. Mary McDonald. Ms. Petschonek also asserted that HSA

members "express[ed] concern" about the delay in purchasing computer equipment, and that she forwarded those concerns to Father Parham and Mr. Pelech. She asserted that she refused to remain silent about these concerns, and that she wrote to Mr. Pelech, urging him to use the funds for the purpose for which they were raised. She asserted that on May 29, 2008, Assistant Superintendent of Schools Janet Donato and Father Parham called her out of a faculty in-service meeting and told her that it was her last day of employment and that she should immediately pack her things and turn in her keys. She asserted that the only stated reason for the abrupt discharge was a "loss in confidence in her leadership," and that this was a mere pretext where there was no factual basis for any loss of confidence.

In April 2010, the Diocese again moved to dismiss the action for failure to state a claim. The Diocese asserted that, in her amended complaint, Ms. Petschonek had failed to identify any law or clear public policy allegedly violated by the Diocese. The Diocese answered in April 2010, denying allegations of wrong-doing and asserting that Ms. Petschonek had ordered computers and software licenses without authorization. It further asserted that the invoices referred to in Ms. Petschonek's amended complaint were paid in late June or early July 2007. The Diocese denied that the funds raised by the HSA were raised solely for the purpose of making technology purchases, and asserted that funds raised through activities specifically intended to support technology purchases were used to purchase computers and software for the following academic year. The Diocese further asserted that Ms. Petschonek was not discharged, but that she was compensated for the term of her contract and that her annual contract had expired and was not renewed. The Diocese asserted that Ms. Petschonek had failed to state a *prima facie* case and that her claims were barred by the one-year statute of limitations.

In July 2010, the Diocese moved for summary judgment on the grounds that Ms. Petschonek's action was barred by the one-year statute of limitations provided by Tennessee Code Annotated § 28-3-104(a)(1). The Diocese asserted that Ms. Petschonek's cause of action accrued when she was orally informed that her contract would not be renewed, and that she was informed by Father Parham on April 14, 2008, and again on May 1, 2008, that her contract would not be renewed. The Diocese asserted that Ms. Petschonek's claim was barred by the statute of limitations where it was filed on May 20, 2009, more than one-year after she had notice that her contract would not be renewed.

The trial court denied the Diocese's motion to dismiss on December 2, 2010. On December 3, 2010, the Diocese moved the court for permission to appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. In February 2011, Ms. Petschonek voluntarily non-suited her statutory claim and stated that she would proceed on only her common law whistle blower claim.

In February 2011, the Diocese filed a memorandum in support of its motion for summary judgment, asserting, *inter alia*, that Ms. Petschonek was not an at-will employee, but was employed under a written contract of employment for a one-year term, and that she had failed to identify any law or clear public policy allegedly violated by the Diocese. It again asserted that Ms. Petschonek was not terminated before the end of her contractual period, but that she was paid through the end of the contract period and that the contract was not renewed.

Following a hearing on April 15, 2011, the trial court denied the Diocese's motion for summary judgment by order entered July 5, 2011. The trial court determined that the termination provision in Ms. Petschonek's employment agreement that allowed the Diocese to terminate the contract at any time, for no cause or reason, created an at-will employment relationship as a matter of law. The trial court further found that a genuine issue of material fact existed with respect to the remaining elements of Ms. Petschonek's claim, and that summary judgment was not appropriate under *Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777 (Tenn. 2010).

The Diocese again moved for an order granting permission for interlocutory appeal pursuant to Rule 9. The trial court granted the motion in October 2011. We granted the Diocese's application on November 3, 2011. In its brief to this Court, the Diocese raised the additional issue of whether, under the "ministerial exception," the court lacks jurisdiction to adjudicate this matter.

### *Discussion*

We turn first to the Diocese's assertion that the courts lack jurisdiction over this matter under the ministerial exception. The courts have long held that, under the First Amendment, the courts may not interfere with matters of government, faith or doctrine of religious institutions. *Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Emp't Opportunity Comm'n,* 132 S.Ct. 694, 704 (2012). Under the ecclesiastical abstention doctrine, the courts will not interfere with claims alleging improper conduct by religious institutions when the conduct is "rooted in religious belief." *Redwing v. Catholic Bishop for Diocese of Memphis*, --- S.W.3d ----, 2012 WL 604481, at *9 (Tenn. Feb. 27, 2012) (quoting *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657 (10th Cir.2002)). However, the courts may adjudicate matters that involve religious institutions when "the court can resolve the dispute by applying neutral legal principles and is not required to employ or rely on religious doctrine to adjudicate the matter." *Id.* (citing *see Jones v. Wolf*, 443 U.S. 595, 602–07 (1979); *New York Annual Conference of United Methodist Church v. Fisher*, 182 Conn. 272, 438 A.2d 62, 68 (Conn. 1980) (holding that "[i]t is now well established that state judicial intervention is justified when it can be accomplished by resort

to neutral principles of law . . . that eschew consideration of doctrinal matters such as the ritual and liturgy of worship or the tenets of faith."); *McKelvey v. Pierce*, 800 A.2d 840, 856 (N.J. 2002) (holding that the First Amendment does not apply if "the dispute can be resolved by the application of purely neutral principles of law and without impermissible government intrusion (*e.g.*, where the church offers no religious-based justification for its actions and points to no internal governance rights that would actually be affected)"; *Lacy v. Bassett*, 132 S.W.3d 119, 123 (Tex. Ct. App. 2004) (noting that "a state may adopt an approach, including neutral principles of law, for resolving church disputes that do not involve consideration of doctrinal matters")). Under this "neutral legal principles approach . . . the courts . . . 'give no greater or lesser deference to tortious conduct committed on third parties by religious organizations than we do to tortious conduct committed on third parties by non-religious entities.'" *Id.* at *10 (quoting *Malicki v. Doe*, 814 So.2d 347, 361 (Fla. 2002)). The "danger" that "the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs" is not "applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud, breach of contract, and statutory violations are alleged." *Id.* (quoting *Gen. Council on Fin. and Admin. of United Methodist Church v. Superior Ct. of Cal., San Diego Cnty.*, 439 U.S. 1355, 1372–73, 99 S.Ct. 35, 58 L.Ed.2d 63 (1978) (citation omitted); *see also Roman Catholic Diocese of Jackson v. Morrison*, 905 So.2d 1213, 1236 (Miss. 2005) (stating that "[w]e read *Watson [v. Jones]* to hold only that civil courts may not take jurisdiction over a religious organization's internal, ecclesiastical matters")).

"The relationship between an organized church and its ministers is its lifeblood." *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir.1972). Neither the legislatures nor the judiciary may interfere with the regulation of church administration or operation, or matters concerning the appointment of clergy. *Kreshick v. St. Nicholas Cathedral*, 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 107–108, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952). The "ministerial exception" evolved in response to the Civil Rights Act of 1964 and other legislation that prohibit discrimination in the employment context. *Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Emp't Opportunity Comm'n,* 132 S.Ct. 694, 705 (2012). The exception "precludes application of such legislation to claims concerning the employment relationship between a religious institution and its ministers." *Id.* (footnote omitted). Employment discrimination laws may not be used, for example, to compel the Catholic Church or an Orthodox Jewish seminary to ordain women. *Id.* at 706. The ministerial exception is not limited to a religious institution's decision to discharge a minister for a religious reason. *Id.* at 709. Rather, it "ensures that the authority to select and control who will minister to the faithful - a matter 'strictly ecclesiastical' . . . - is the church's alone." *Id.* (quoting *Kedroff*, 344 U.S. at 119, 73 S.Ct. 143).

In *Hosanna-Tabor*, the Supreme Court concurred with the Courts of Appeal that the ministerial exception "is not limited to the head of a religious congregation[,]" but extended to other employees that "qualif[y] as a minister." *Id.* at 707. The Court held that, under the circumstances, the plaintiff in *Hosanna-Tabor*, a "called teacher" who fulfilled academic study requirements, passed an oral examination by faculty at a Lutheran college, was accorded the title "Minster of Religion, Commissioned," and was held out as a minister by the Church, qualified as a minister for the purpose of the exception. *Id.* The *Hosanna-Tabor* Court held that the ministerial exception barred the plaintiff's suit alleging unlawful retaliation under the Americans with Disabilities Act ("ADA"), codified at 42 U.S.C. § 12101 et seq. (1990), and the Michigan Persons with Disabilities Civil Rights Act, codified at Mich. Comp. Law § 37.1602(a)(1979). *Id.* at 710.

The Supreme Court specifically declined to opine, however, on whether the ministerial exception would bar other types of actions, including claims by employees asserting breach of contract or tortious conduct by religious employers. *Id.* The ministerial exception recognized by the *Hosanna-Tabor* Court, therefore, was narrowly limited to claims asserted by ministers, or employees who qualify as ministers, asserting violations of statutes prohibiting discrimination in the work place. The Tennessee Supreme Court, furthermore, has observed that, with respect to the ecclesiastical abstention doctrine, application of the doctrine to matters not rooted in religious belief

> "runs the risk of placing religious institutions in a preferred position, *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 336 (5th Cir.1998), and favoring religious institutions over secular institutions could give rise to Establishment Clause concerns." (*See* Zanita E. Fenton, *Faith in Justice: Fiduciaries, Malpractice & Sexual Abuse by Clergy*, 8 Mich. J. Gender & L. 45, 75 (2001) (noting that "non-application of tort principles where they might otherwise apply may be more like Establishment, creating an exception for religion")).

*Redwing v. Catholic Bishop for Diocese of Memphis*, --- S.W.3d ----, 2012 WL 604481, at *10 (Tenn. Feb. 27, 2012).

The Diocese asserts that Ms. Petschonek similarly qualifies as a minister. It further asserts that the ministerial exception bars actions alleging common law retaliatory discharge against it. The Diocese contends that this is a jurisdictional matter which can be asserted at any time, including for the first time on interlocutory appeal.

Subject matter jurisdiction concerns the courts' authority to adjudicate a matter and cannot be waived. *Meighan v. U.S. Sprint Commc'ns Co.*, 924 S.W.2d 632, 639 (Tenn. 1996) (citing *Landers v. Jones*, 872 S.W.2d 674, 675 (Tenn.1994)). As the Diocese asserts,

"'the issue of subject-matter jurisdiction can be raised in any court at any time.'" *Freeman v. CSX Transp., Inc.*, 359 S.W.3d 171, 176 (Tenn. Ct. App. 2010)(quoting *Scales v. Winston*, 760 S.W.2d 952, 953 (Tenn. Ct. App. 1988)); (citing *see also* Tenn. R. App. P. 13(b)). The *Hosanna-Tabor* Court noted, however, that the Courts of Appeal were split over whether the ministerial exception was a defense on the merits or operated as a jurisdictional bar. *Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Emp't Opportunity Comm'n,* 132 S.Ct. 694, 709 n.4 (2012). The Court held that the exception is an affirmative defense, and not a jurisdictional bar. *Id.* It stated, "[t]hat is because the issue presented by the exception is 'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has 'power to hear [the] case.'" *Id.* (quoting *Morrison v. National Australia Bank Ltd.*, 561 U.S. —, —, 130 S.Ct. 2869, 2877, 177 L.Ed.2d 535 (2010)(internal quotation marks omitted)).

This Court and the trial court accordingly have jurisdiction to adjudicate this matter. We decline to address the issue of whether Ms. Petschonek's cause of action is barred by the ministerial exception where it has not been certified as an issue for interlocutory appeal under Rule 9, has not been adjudicated by the trial court, and has not been raised as an affirmative defense by the Diocese. In so doing, we express no opinion on whether an action alleging common law retaliatory discharge, a cause of action intended to protect the public by encouraging employees to report an employer's illegal or unethical activity, *Guy v. Mutual of Omaha Insurance Co.*, 79 S.W.3d 528, 537 (Tenn. 2002), is sufficiently similar to a cause of action alleging retaliatory discharge in violation of the ADA, a statute protecting certain individuals from discrimination in the work place, to warrant application of the ministerial exception. *See, e.g., Burns v. Coca-Cola Enterprises, Inc.*, 222 F.3d 247, 257 (6th Cir. 2000) (quoting 42 U.S.C. § 12111(8): ("the ADA only protects 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"). We observe, however, that the courts historically have "give[n] no greater or lesser deference to tortious conduct committed on third parties by religious organizations than we do to tortious conduct committed on third parties by non-religious entities.'" *Redwing,* --- S.W.3d ----, 2012 WL 604481, at *10 (quoting *Malicki v. Doe*, 814 So.2d 347, 361 (Fla. 2002)).

We next turn to whether Ms. Petschonek presented a *prima facie* case of common law retaliatory discharge. Common law retaliatory discharge imposes a restriction to the employment-at-will doctrine historically adhered to in Tennessee. *Guy,* 79 S.W.3d at 535. The employment-at-will doctrine "provides that an employment contract for an indefinite term is terminable at the will of either the employer or the employee for any cause or for no cause." *Id.* The burden is on the plaintiff asserting a claim of common law retaliatory discharge to demonstrate: (1) the existence of an employment-at-will relationship; (2) that the employee was discharged; (3) that the employee was discharged for attempting "to

exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision;" and (4) that the employee's exercise of those protected rights or compliance with that clear public policy was a "substantial factor in the employer's decision to discharge." *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 437-38 (Tenn. 2011)(citations omitted).

In this case, it is undisputed that Ms. Petschonek's employment was governed by a written contract of employment entered into by the parties on June 10, 2006. The contract contained in the record provides:

> The term of this agreement shall be a one year school term beginning on June 10, 2006, and continuing through June 10, 2007, with no promise of continuing employment beyond the Agreement term. Nothing in this Agreement should be construed as a promise of a future or multiple year agreement of future compensation.

It also provides for "involuntary termination" for cause, and for "voluntary termination" by either party. The contract states:

> In addition to the right of Involuntary Termination by Employer above, Employer may terminate the Agreement for no cause or for no reason by giving written notice to Principal. In the event Employer terminates the Agreement under this voluntary termination section, Principal shall be entitled to 30 days compensation.

It further provides:

> This Agreement may be terminated by the Principal by giving written notice thirty (30) school days prior to the effective date of termination. If the Principal terminates without giving the required 30 school days notice, Principal shall

pay the Employer 30 days of compensation as liquidated damages to compensate the Employer for injury by reason of the Principal's breach of this Agreement. . . . This liquidated damages provision shall not be construed to limit in any way the Employer's right to pursue any other remedies available to it, including injunctive or other equitable relief against the Principal to enforce the terms of this Agreement.

The Agreement recites that it contains the entire agreement of the parties, supercedes all prior agreements, and may be changed only by a writing signed by both parties. It also contains a "Miscellaneous" provision emphasizing that it does not contain a renewal clause, that it is only for the term recited, and that nothing in it shall be construed as an obligation by either

party to enter into any other agreements.

Ms. Petschonek asserts, and the trial court determined, that the provision allowing the Diocese to terminate the contract at any time, for no cause or reason, created an at-will relationship. The Diocese, on the other hand, contends that the employment relationship was not an at-will relationship, but that Ms. Petschonek was employed under a contract for a definite term. It additionally contends that Ms. Petschonek was not "discharged," but that she was compensated for the entire contractual term and that her contract simply was not renewed.

Both parties rely on *Little v. Federal Container Corp.*, 452 S.W.2d 875 (Tenn 1969), in support of their arguments. The *Little* court stated:

> Generally, a contract of employment for an indefinite term is a contract at will and may be terminated by either party. *Combs v. Standard Oil Co. of Louisiana* (1933), 166 Tenn. 88, 59 S.W.2d 525; *McCall v. Oldenburg* (1964), 53 Tenn. App. 300, 382 S.W.2d 537. Whereas, a contract for a definite term may not be terminated before the end of the term, [e]xcept for cause or by mutual agreement, unless the right to so do is reserved in the contract. 56 C.J.S. Master and Servant § 30, p. 411.

*Little*, 452 S.W.2d at 877-78. Ms. Petschonek submits that this statement stands for the proposition that, "notwithstanding the definite term of a contract, the employment relationship remains at-will as long as the right to terminate at-will is reserved in the contract." The Diocese, however, contends that the right to terminate before the end of the term is a contractual provision that may be reserved by the parties in a definite term contract. We agree with the Diocese.

The employment at-will doctrine "applies in the absence of a contract of employment, and it means that an employment relationship generally can be terminated by either the employer or the employee with or without cause." *Cantrell v. Knox County Bd. of Educ.*, 53 S.W.3d 659, 662 (Tenn. 2001)(citation omitted). Accordingly, absent an employment contract for a definite term, an employee who is discharged has no cause of action against the employer because the employee does not have a right to continued employment. *Id.* An employment contract for a definite term, on the other hand, generally may not be terminated before the end of the term without good cause or by mutual agreement. *Id.*

In an action for breach of an employment contract, the "measure of damages is the salary that would have been earned had the contract not been breached, less any amount the employee earned or should have earned in the exercise of reasonable diligence in some other

employment during the unexpired contract term." *Id.* (citations omitted). By contrast, "without a clear contract under which such rights may vest, employees in this State possess no property right in their employment . . . ." *Bennett v. Steiner-Liff Iron and Metal Co.*, 826 S.W.2d 119, 121 (Tenn. 1992). The supreme court since *Little* has noted that "a contract of employment for a definite term may not be terminated before the end of the term, except for good cause or by mutual agreement, unless the right to do so is reserved in the contract." *Id.* (citing *Nelson Trabue, Inc. v. Professional Management–Automotive, Inc.*, 589 S.W.2d 661 (Tenn.1979)).

The parties to a definite term contract may reserve the right to terminate the contract before the end of the contract period within the parameters defined by the parties. The reservation of this right is but one provision of a definite term contract. Like other provisions contained in the contract, it is part of the bargain made by the parties. Retaining this right does not transform an otherwise enforceable definite term contract into an at-will employment relationship, particularly where the definite term contract contains mutual rights to terminate the contract before the expiration of the contract term, and mutual obligations in case of early termination.

The interpretation of a contract is a matter of law that we review *de novo* on the record, with no presumption of correctness for the determination of the trial court. *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011). The "cardinal rule" of contract construction is to ascertain the intent of the parties and to effectuate that intent consistent with applicable legal principles. *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999). When the language of the contract is plain and unambiguous, courts determine the intentions of the parties from the four corners of the contract, interpreting and enforcing it as written. *Int'l Flight Ctr. v. City of Murfreesboro*, 45 S.W.3d 565, 570 (Tenn. Ct. App. 2000).

The contract contained in the record in this case recites mutual duties and obligations of the parties. Although it reserves the Diocese's right to terminate Ms. Petschonek's employment without cause, it also provides that she would be entitled to 30 days compensation in case of early termination. Additionally, under the contract, Ms. Petschonek also reserved the right to terminate the contract before the end of the contract term, and the agreement provided for a liquidated damages amount equal to 30 days compensation. The reservation of the right to terminate the contract before the end of the contract term, and the corresponding obligations, were mutual. Ms. Petschonek was not an employee at-will, but was employed under a contract of employment for a definite term. She accordingly has failed to present a *prima facie* case of common law retaliatory discharge.

### *Holding*

-11-

In light of the foregoing, the judgment of the trial court denying the Diocese's motion for summary judgment is reversed. The remaining issue is pretermitted as advisory in light of this holding. Costs of this appeal are taxed to the Appellee, Carol Petschonek. This case is remanded for further proceedings consistent with this opinion.

_____
DAVID R. FARMER, JUDGE